KLIEBERT, Judge.
In April 1974, Mid-Gulf Construction, Inc. (contractor), entered into a contract with the St. Charles Parish Police Jury (owner) for the construction of a new courthouse and jail facility in Hahnville, Louisiana. The owner had previously contracted with Cimini Meric and Associates, Inc. (architect) to provide architectural and engineering services for the project. The architect, in turn, obtained the services of Beall Engineers, Inc. (engineer) as the project engineer.
In May 1975, while the contractor was proceeding with a concrete pour of the facilities’ third floor, Mr. Everett Downing, the Clerk of Works and, hence, the owner’s representative, reported to the engineer that the concrete was not being poured in a satisfactory manner. After investigations by the engineer and the architect, the architect stopped work on the building. Following core analysis and load testing, the architect accepted the floor and the job proceeded. Following occupancy of the building, 'the contractor sued the owner to recover the costs of these tests, including the added expenses due to the delays in the construction, under a contractual provision and, in a supplemental pleading, sought an additional $25,000.00 alleged as being held by the owner as contract retainage. The owner then brought a third party action against the architect and engineer in damages for any amounts which the pwner may be required to pay under the contractor’s suit.
After a trial on the merits, held in June 1981, the trial judge found the floor defective and the contractor at fault for the defective floor and in not satisfactorily completing the agreed-upon tests of structural integrity of the concrete floor. The judgment also contained a finding the architect and engineer were at fault in the discharge of the duties and responsibilities they owed to the owner. The judgment dismissed the contractor’s suit and the owner’s third party demand against the architect and engineer.
The contractor devolutively appealed the judgment. It assigns as errors the trial court’s: (1) holding the floor was defective, (2) failure to find the architect and engineer had ordered a “special test” within the intendment of Article 7.8.2 of the general provisions of the contract, (3) failure to award to the contractor the sum of $197,-431.00 as the cost of the special test and delay expenses, and (4) failure to award to the contractor $25,000.00 alleged to be a retainage on the contract price held by the owner. The engineer and the architect answered the appeal and asked for a reversal of the trial judge’s finding that they were at fault in the discharge of the duties and responsibilities they owed to the owner. We affirm the trial court’s judgment dismissing the contractor’s claim and the owner’s third party demand against the architect and the engineer.
The problems involved here commenced during the construction of the third floor. The Clerk of the Works was present during the pour of the concrete for the third floor. He observed concrete being poured alongside of hardened concrete and feared cold joints[1] were being formed on the third floor. He informed the engineer and the architect of his observations and fears. *771 Thereafter, by telegram dated May 29, 1975, the architect informed the contractor the concrete pour was suspect and, hence, after further inspection, might result in the rejection of the pour. The structural engineer, Beall, personally inspected the concrete pour on June 2,1975. He advised the architect on June 3, 1975 that: (1) the concrete had not been poured in accordance with the contract specifications, (2) cold joints appeared to be prevalent throughout the floor system, and (3) concrete had been chipped away with a jackhammer and then repaired with sand mortar grouting.
The architect concurred with the engineer’s investigation. Therefore, by letter dated June 3,1975, he rejected the concrete poured on May 27, 1975, suspended further concrete pourings and requested the contractor submit, for review, a detailed outline of remedial action to be taken by him. The letter also pointed out the particular contract specifications which in the architect’s judgment had been violated. In compliance with the architect’s request, as part of a remedial plan to prove the structural integrity of the concrete, the contractor brought in Gulf South Laboratories to drill and test cores of the concrete poured on May 27, 1975. On June 10, 1975, seven cores were drilled in areas designated by the engineer. According to Gulf South Laboratories’ test report the compression strength of the concrete appeared satisfactory. However, the test showed a cold joint existed in one of the cores and three of the cores indicated a highly porous mortar grout topping ⅛" to ¾" thick. Compression strength tests conducted on the cores in the laboratory led Gulf South to conclude the cores were in compliance with the designed requirement of 4000 P.S.I. (pounds per square inch) compression strength required for the concrete used in the project.
Approximately fourteen days[2] after the concrete was poured on the third floor, the metal pan (forms) were removed revealing the underside of the slab. According to the engineer and the architect there was extensive honeycombing, voids and apparent cold joints, and exposed reinforcement bars throughout the floor. Both believed the pour was the worst they had ever inspected. By letter dated June 24, 1975, the architect again rejected the third floor pour and advised Mid-Gulf to either demolish the third floor pour or liveload test[3] the questionable area of the third floor.
On July 1, 1975, the contractor informed the architect it had employed an engineer, Mr. Lyman Ellzey, to inspect the work and give his opinion regarding the structural integrity of the pour and if after receiving and reviewing his report if “it is still deemed necessary to load test the third floor we shall load test same as required.” According to the report of Mr. Ellzey, dated July 11, 1975, he recommended the contractor choose the option of load testing the questionable area (as opposed to demolishing the concrete in the questionable area) to satisfy the requirements of the design engineer and the architect on the project.
The contractor brought in Shilstone Testing Laboratory, Inc. to monitor the liveload test. The suspect area of the pour was determined to be 9,000 square feet. The contemplated test area consisted of 14,000 square feet. The contractor was responsible for setting up the test with Shilstone monitoring the results. Water was used as a liveload and placed into forms prepared by the contractor. The test was not conducted in strict accordance with AIA (American Institute of Architect) recommendations, as originally contemplated, because some of the forms built by the contractor did not hold sufficient water to load the concrete with the desired weight for the *772 desired length of time. The load test, however, led the engineer (according to his testimony) to conclude that although the concrete did not meet the concrete specifications in the contract it would carry the load it was designed to carry. Notwithstanding the test deficiencies, the architect, by letter dated September 11,1975, accepted the concrete third floor and subsequently advised the police jury to accept the building.
The trial of this case was long and tedious; the exhibits numerous and the witnesses many and varied. The trial judge gave extensive reasons for judgment and summarized the testimony of the witnesses as to the defective floor as follows:
“Downing, the engineers project representative, found the pour to be- slowly made, with considerable delay between the pouring of each batch of concrete. So slow that previously poured batches hardened before the next batch was poured.
Di Maggio, an inspector for Shilstone Testing Laboratory, found considerable honeycombing in the concrete.
Cronic, an inspector for Gulf South Laboratories, through core tests, found the third floor met minimum structural compressive strength. He also found the tests to indicate the presence of cold joints in the concrete with cold type shear breaks of 2" X 1" revealing lack of bond between the batches of poured concrete. He also found lines of demarcation between poured batches that indicated cold joints.
Ockman, plaintiffs carpenter foreman who turned concrete pourer on May 27, 1975, denied the pour was slow but admitted that only one concrete truck at a time was used because plaintiff was also pouring concrete stairs at the same time of the third floor pour. He denied the concrete hardened during the pour but admitted there was some tightening up of the concrete during the pour requiring the use of vibrators. His visual inspection of the pour found no voids but he did find honeycombing through which he could see the steel reinforcement bars.
Schreffler, plaintiff’s superintendent on the job, when not blaming Downing for everything, admitted the pour was slow and that it was slowed because the pouring of the concrete stairs was being done at the same time. He claimed the honeycombs, the voids and the exposed steel reinforcement bars were corrected.
Ellzey, the consulting engineer for plaintiff, admitted he was shown some alleged cold joints, one beam and 2 joists; he admitted there was honeycombing, but not enough for alarm; he admitted there were voids; he was not impressed with the amount of effervesence of the concrete but admitted there was effervesence. His opinion was that the structural design of the concrete was O.K., but he recommended load tests on the suspected areas.
Sellers, the sub-contractor who installed the steel reinforcement bars, testified that the pour was too slow; he watched the concrete harden and break while the pour continued; he saw plaintiff’s employees using vibrators on hard concrete, saw them use hands and feet to knock the hardened concrete down; he saw exposed steel reinforcement bars, voids and separated concrete. He estimated the slowness of the pour in comparison with the time taken to make the pours for the first and second floors of the building.
Adams, an inspector for Gulf South Laboratory, said the third floor pour was not from pan to pan; in one section he saw plaintiff’s employees breaking hardened concrete with pick axes and shovels while the pour was being made. After the pour he saw numerous honeycombs, exposed steel reinforcement bars and discolored layers of concrete with lines between them.
Beall, the project engineer, testified the core tests definitely revealed cold joints; that the floor leaked like a seive; that there were honeycombs, cold joints, exposed steel reinforcement bars and the concrete was very porous. He worried about the effervesence of the concrete. He had never seen before a concrete floor with so many cold joints. He found a *773 strip 30' X 3' that appeared to be covered with mortar — he fears the mortar was used to cover defective concrete. He found large areas where the concrete had been chopped up or dug up. The finishing concrete for the plumbing lines appeared to have been poured after the floor hardened. The third floor slab was the worst slab he had ever seen.
He is of the opinion the whole floor is faulty and he wanted the whole floor removed. He rejected the whole floor in its entirety. He never wanted the tests— he wanted the floor removed. He fears for the future stability of the floor. He approved the floor but is still of the opinion the floor is no good.
Habestertinger, a consulting engineer, found honeycombs, voids, and cold joints throughout the floor. One cold joint ran across the middle of the whole floor. The concrete was so porous that water poured through. There are two shear lines 30' long and 5' apart in the most dangerous area of the floor.
Meric, the architect, testified that he found water pouring through the concrete; the concrete was discolored; the main beam for the floor was poorly molded with concrete; there were honeycombs and voids so large that he could put his hand inside and touch the steel reinforcement bars.
Based on this testimony, the trial judge found the floor was defective when poured, faulty when tested, faulty when accepted by the architect and structural engineer and remained faulty on the date his judgment was written.
From our own review and analysis of the record, not only can we not say the trial judge’s summary of the testimony was erroneous, but in addition, we found the record established a reasonable factual basis to support his holding that the concrete flooring was defective. Since there was a reasonable factual basis to support his finding of fact, under the standard of review to which we are bound, we cannot disturb his finding. Canter v. Koehring, 283 So.2d 716 (La.1973). Thus, the issue narrows itself to the question of whether under the contract provisions the owner or the contractor is obligated to pay for the cost of conducting the liveload test which led the architect and engineer to conclude that although defective, the concrete floor had sufficient structural integrity to carry the design load.
The contractor contends the liveload test was a “special test” within the intendment of Section 7.8.1 and 7.8.2 of the general conditions of the contract. These provisions provide as follows:
7.8.1 If the Contract Documents, laws, ordinances, rules, regulations or orders of any public authority having jurisdiction require any work to be inspected, tested or approved the Contractor shall give the Architect timely notice of its readiness and of the date arranged so the Architect may observe such inspection, testing or approval. The Contractor shall bear all costs of such inspections, tests and approvals unless otherwise provided.
7.8.2 If after the commencement of the work the Architect determines that any work requires special inspection, testing or approval which Subparagraph 7.8.1 does- not include, he will, upon written authorization from the owner, instruct the Contractor to order such special inspection, testing or approval, and the Contractor shall give notice as in Subpar-agraph 7.8.1. If such special inspection or testing reveals a failure of the work to comply (l)'with the requirements of the Contract Documents or (2) with respect to the performance of the work, with laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, the Contractor shall bear all costs thereof, including the Architect’s additional services made necessary by such failure; otherwise the Owner shall bear such costs, and an appropriate Change Order shall be issued.
Having reached the conclusion the liveload test is a “special test”, he then argues that since the results of the test caused the architect and the engineer to accept the structural integrity of the concrete third floor, the owner is required to bear the cost *774 burden of determining the structural integrity of the floor. We disagree.
Although no one anticipated the ultimate need for a liveload test to determine the structural integrity of the concrete pour on the third floor, it does not follow that Section 7.8.2 is to be applied in determining whether the owner or the contractor is to bear the cost of the test in the present situation. Here, the engineer and the architect believed and the trial judge specifically found the third floor concrete pour failed to meet contract specifications because of the existence of honeycombing, voids, cold joints, and exposed steel reinforcing bars. While the contractor contends it disagreed with the architect’s and engineer’s conclusions as to the deficiencies in the floor, it does not argue the trial court erred in its factual holding the deficiencies existed; nor does it point to any evidence that would contradict the trial court’s finding of these deficiencies. Instead, it seeks to minimize the deficiencies by admitting the floor was not a perfect floor in its • cosmetic and aesthetic appearance. A floor poured in the manner testified to here was poured in violation of the contract specifications and since it contained honeycombing, voids, and cold joints, it was defective and the engineer and architect acted properly in requiring the contractor to remove the floor or prove its structural integrity at its cost.
The load test was not intended to disprove the results of the core test. Rather, the load test was to determine whether notwithstanding the existence of cold joints, honeycombing and voids and, hence, violations of contract specifications, the floor could structurally withstand the load it was designed to carry. The load test could not and did not establish that the third floor pour complied with the contract specifications. Rather, despite the noncompliance with contract specifications, the test led the experts to conclude the floor would carry its designed load. Hence, Section 7.8.2 is not applicable here.
The applicable general provisions for work rejected by the architect are Articles 13.2.1 and 13.2.3 of the general conditions of the contract which provide as follows:
13.2.1 The contractor shall promptly correct all Work rejected by the Architect as defective or as failing to conform to the Contract Documents whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Contractor shall bear all costs of correcting such rejected Work, including the cost of the Architect’s Additional Services thereby made necessary. (Emphasis added.)
13.2.3 All such defective or nonconforming Work under Subparagraphs 13.2.1 and 13.2.2 shall be removed from the site as necessary, and the Work shall be corrected to comply with the Contract Documents without cost to the owner. (Emphasis added.)
From these provisions it may seem the architect was not required to give the contractor the option of performing a load test instead of tearing out the third floor concrete pour. The architect could have simply required the contractor to remove the floor at his own cost since it did not conform to the contract specifications. Nevertheless, under the contract, the architect could and did give the contractor the option of load testing the concrete to prove that despite non-compliance with contract specifications the concrete could perform in accordance with the design requirements. The contractual provisions relative to the option are contained in Chapter 18 of the Specifications for Structural Concrete .(AC1.301.72) which is made part of the contract by Article 1.03a of the contract specifications for the project.
Where rejection of a concrete pour occurs, Chapter 18 of AC1.301-71 contemplates two types of test; namely, core tests and load tests under the following provisions:
18.4.3 Core tests in accordance with Section 17.3.2 may be required when the strength of the concrete in place is considered potentially deficient.
18.4.4 If core tests are inconclusive or impractical to obtain or if structural anal *775 ysis does not confirm the safety of the structure, load tests may be required and the results evaluated in accordance with Chapter 20 of “Building Code Requirements for Reinforced Concrete” (ACI 318).
18.4.6 The contractor shall pay all costs incurred in providing the additional testing and/or analysis required by this Chapter. (Emphasis added.)
Under these provisions, the contractor is required to bear the burden of the test. If the architect had required the contractor to tear out the third floor concrete pour for non-compliance with contract specifications under the general provisions the floor would have to be removed at contractor’s cost. Likewise, the contractor must bear the cost of the load test which it chose to perform in lieu of tearing out the floor.
The contractor, however, argues that giving effect to these provisions would alter the meaning of the general contract conditions. We do not agree. The provisions for load testing contained in AC1.301-72 apply where concrete is rejected because of its failure to meet contract specifications, whereas, the provisions of Article 7.8.2 relied on by the contractor applies only where a test is required to show contract specifications are in fact met.
Whether the decision of the architect and/or the structural engineer was correct in accepting the third floor, notwithstanding the fact it did not meet contract specifications and notwithstanding the failure to complete a liveload test, as originally contemplated, is not necessary to a decision in this case. The suit by the contractor against the owner was for the reimbursement of costs, including added expenses of delays, incurred in performing the liveload test. The third party suit by the owner against the architect and the engineer was limited to a claim for recovery against them of any amount the owner might be obligated to pay to the contractor. When the contractor’s claim fell, so did the third party claim against the architect and the engineer because the owner was not required to pay the contractor for the test. Hence, it is unnecessary for us to consider the negligence (or lack of negligence) of the architect or the engineer. We might say, however, that it is abundantly clear the engineer and the architect acted properly and in the better interest of the owner when they rejected the concrete pour and requested the taking of the core and liveload test.
The remaining issue to be considered is the trial judge’s refusal to order the payment to the contractor of the alleged $25,000.00 retainage held by the owner. The only direct evidence as to the retainage amount is the testimony of Mr. Henry Smith, President of Mid-Gulf Construction Company. He testified that the owner was holding $25,000.00 because of a mechanical problem which was unrelated to the problem with the third floor concrete pour.
There was extensive testimony on cross examination, however, showing that the contractor had made claims for 105 days of approved delays for the time lost in testing the third floor concrete which had been refused by the architect and owner and that the contractor was several months past the delivery date even if this time was considered as approved delay. The architect also testified as to time overruns.
In his reasons for judgment, the trial judge concluded the contractor had a 289 day overrun on his completion time and since the daily liquidated damage provision was $200.00 per day, the owner was entitled to hold the retainage. From our review of the record, we cannot say the contractor has met the burden of proving the owner was wrongfully withholding money due to him under the contract; nor can we say the trial judge committed manifest error (as would be required for us to reverse his judgment) in deciding there was in fact more demurrage due than the $25,000.00 retainage claim, hence, the contractor was not entitled to any funds from the owner at that time.
The doctrine of substantial performance urged by the contractor has no application because the contractor has not shown substantial performance. In the absence of same, his recovery is limited to a recovery *776 in quantum meruit. See Merrydale Glass Works, Inc. v. Merriam, 349 So.2d 1315 (1st Cir.1977).
For the reasons stated, therefore, the judgment of the trial court dismissing the contractor’s suit and the owner’s third party claim against the architect and engineer are affirmed. All costs of the appeal to be borne by the contractor.
AFFIRMED.
GAUDIN, J., concurs with written reasons. .

. Cold joints are planes of weakness which are created when fresh concrete is poured over or alongside of concrete which has already started to set up and the new concrete is not properly worked into and bonded with the old concrete. In pouring concrete, it is critical that cold joints be avoided except where they are specifically incorporated into the design, since the existence of cold joints may affect the shear strength of the concrete in place.

. The minimum curing time for the concrete. Concrete does not reach its maximum curing strength until 28 days after it is poured and sets.

. Liveload testing is a procedure where the suspected area in question is loaded to a predetermined weight and held at that weight for a predetermined length of time to determine the slab’s ability to withstand the weight. Shear strength is the tested characteristic. The shear strength is determined by the amount of deflection or movement the slab makes upon being weighted down and upon removal of the weight.